Center. There's a mass exit, Ms. Clark, so you could even sit down if you wanted to. Now we're ready. Thank you. May it please the Court, Ann Clark from Vladeck, Raskin & Clark for the plaintiff appellant Deirdre Chiaramonte. The district court here failed to interpret the Equal Pay Act in accordance with its broad remedial purpose and the precedent of this Court, and construed facts and inferences against the plaintiff instead of in her favor. The only issue before this Court today is whether plaintiff presented sufficient evidence of a prima facie case under the Equal Pay Act, and specifically whether she submitted sufficient evidence that she performed — she and her comparators performed work that was substantially equal in terms of skill, effort, and responsibility. The district — So isn't your problem that the comparators aren't really adequate or accurate comparators? No, Your Honor. The district courts really focused on the fact that they were — had different subspecialties and were in different departments. And performed different sorts of duties. There's disputes about the duties. I'll get to those. First, let me talk about the departments. In Lavin, this Court said that where comparisons were made amongst professors within a division based on rank, tenure status, years of service, and degree held, that was sufficient evidence of skill, effort, and responsibility for it to be a jury issue as to whether a criminal justice professor and a psychology professor were comparable. Here, we have evidence that Dr. Chiaramonte performed specialized medicine in two departments. One, internal medicine board certification was a requirement for her position in the President's Council. What about the district court's conclusion that she couldn't identify a single treatment that she administered at the rehab center that a technician was incapable of performing? Well, they have — they have — that is correct. That is true, Your Honor. However, they have not identified a single procedure performed by any of her comparators that were not or could not have been performed by a technician. Dr. Chiaramonte — Radiology or radiology or dermatology, neurology, internal medicine, those are all areas that a technician could do as well as the supervising veteran? Dr. Chiaramonte in her declaration specified that particularly radiology and dermatology were very technician-driven, that dermatology, even internal medicine, that there were  specialized procedures that Dr. Palma performed were — didn't seem to me of the sort that a technician could perform. Dr. Chiaramonte said that some of the procedures in his internal medicine practice were and could be performed by technicians. There is no specification here as to which could or could not. In fact, if you look at the defendant's chart in which they purport to set forth the differences between Dr. Chiaramonte and her comparators, if you look more closely, it underlies that chart. It encapsulates why summary judgment is inappropriate. So for Dr. Fox, for example, it cites almost entirely to Dr. Goldstein's affidavit. It says, and it doesn't make any reference in the affidavit, that he performed any procedures in cardiology. There is nothing in the affidavit saying he treated inpatients. There is nothing in the affidavit saying that he conducted rounds. It says he was involved in teaching, but that was disputed by the chair of the board, and there was no evidence that Dr. Fox conducted research as opposed to managing the research institute. For Dr. Palma, that chart, the affidavit, again, says he cites some procedures, doesn't specify whether any of them were performed under his supervision by technicians. It says he had inpatient responsibility, which is management of the unit, at Dr. Palma was paid more than the women in internal medicine. Dr. Goldstein said, well, Dr. Palma actually focuses on outpatients, and it's the women in internal medicine who focus on inpatients. The affidavit does not say that Dr. Palma conducted rounds, which is in the chart. And with respect to research, the Fox affidavit for Dr. Palma and Dr. West states Dr. Palma do the stenting, ultrasounds, bone marrow aspirates, biopsies, colonoscopies, rhinoscopies, did he do that? That is what Dr. Fox testified to, but there's no testimony as to whether any of those could not be performed by technicians. Dr. Chiaramonte testified that there were procedures done in internal medicine, which she has knowledge of, she's board certified, that could be performed by technicians and with supervision by aides as well. Can I just ask, I'm trying to understand the record. Dr. Palma is an internal medicine specialist? Correct. And that is what he practiced? Correct. I'm reading this record to be that your client is certified in internal medicine, but she wasn't practicing as a specialist. She was giving general practitioner care. Am I wrong about that?  One, the EPA regulations talk about the skill required for a position, even if it's not called upon as frequently. It was a requirement to be head of the President's Council to be board certified in internal medicine, as all the successors to Dr. Chiaramonte are. And Dr. Chiaramonte said that even though she didn't perform the internal medicine procedures, she drew upon her specialized knowledge of internal medicine in treating the President's Council patients and coordinating their care with specialists. She also ---- Is that a long way of answering Judge Livingston's question, is yes? I think that there is ---- it's not straightforward, but when it comes to the President's Council, in rehabilitation, she was certified. They don't have board certification, but she had certification in the specialized area. Being certified in rehabilitation was required to work in the rehabilitation center. She did perform rehabilitation treatments in the rehabilitation center. And there's evidence to all of that in the record. The ---- in Lavin, the court also looked at, you know, in terms of the department versus department, that in Lavin there was no evidence that different departments had different pay structures or that that accounted for pay differences. Here we have the same evidence. If department was something that drove the compensation, one would expect that all cardiologists, all internal medicine doctors were paid more than Dr. Chiaramonte if we're saying she doesn't count for internal medicine. But the women in those departments were paid less than Dr. Chiaramonte. It's only when you look within departments that had men and women that you see that the men were paid more than the women and that the reasons given for that are all over the place. I would urge the judges to look at Dr. Goldstein's deposition testimony at CA405 to 418. It's like a guessing game as to why one person makes more than another. Why does Dr. Palma make more than the women in internal medicine? Well, I think he works more days per week. Well, is that a factor in setting compensation? No. Well, then, what is it really? Well, I think it's because he ---- it might be because he does outpatient and they do inpatient, which is contrary to the chart. I would also point out that Dr. Goldstein, the lynchpin of the defendant's case, did not get involved in setting compensation until Dr. Chiaramonte was fired. There are also many reasons to doubt or to discredit his testimony. And as the Supreme Court said in Reeves, summary judgment cannot be based upon accepting wholesale the affidavit of an interested witness. Would you like to use some of your rebuttal time? I'll save the rebuttal time. Mr. DiLorenzo. Good morning, Your Honors. I'm Lou DiLorenzo. I represent the two defendants in this case, the Animal Medical Center and Ms. Catherine Coyne, who sued individually. We disagree vehemently with what was just presented by opposing counsel. First of all, Your Honors, we believe this case is not controlled by the Lavin-Maris College case. We believe it's controlled by the Port Authority case. And if you look at that case, which I know you're familiar with, that case makes it clear that lawyers are not lawyers are not lawyers, and doctors are not doctors are not doctors. In fact, the only three differences, I think, between that case and this case in terms of what the law is, is that first it was lawyers and not doctors. Second, that was on a 12B6 motion. This one is after eight depositions, thousands of pages. Everybody's salary and the whole place was evaluated over our objection. We made a 12B6 motion, and we lost it, because there were no comparators at all in the original complaint. We made a motion to dismiss that complaint. There was an amended complaint using two doctors from the 990 IRS form. We moved to dismiss against that. By the narrowest of margins, Judge Fala said, I'm going to allow discovery because the cases indicate these cases all turn on the facts. And it was probably a correct decision. We then did all the extensive discovery. All the facts were eliminated. Counsel has said the linchpin in this case was Dr. Goldstein. He wasn't the linchpin. The linchpin in this case was the plaintiff's testimony. The plaintiff gave a deposition where she made all the admissions that fall into the very questions you've been answering. This plaintiff in this case saw one or two patients a day as the VIP concierge of the President's Counsel. Her job was defined as unique and the closest thing we have to a job description when she got that job. And I showed it to her at her deposition. And that's in the record at CA 828-29. It's a memo that was sent to the entire Animal Medical Center community by the Chief of Medicine, and it says the first line is, this new position is unique. There's confusion about what Dr. Caramonte is going to do, so I'm putting this memo out to make it clear to everybody. This is 2002. What's the page on that again? CA 828-829. The third paragraph starts off by saying, as the facilitator of care Dr. Caramonte will serve as the conduit to all specialists and services of the hospital for her patients. The major objective of this position is to relieve our busy specialists of the burden of providing frequent communication to these important but often demanding clients. These are people that pay a special, a significant amount of money to get special treatment at the Animal Medical Center. And their point of contact for communication and triage is Dr. Caramonte. She could never make an Equal Pay Act claim. She couldn't, Your Honor. And there's cases that say she could not, unless we hire another general practitioner, a primary care physician for the President's Council, and that other person is a man, and he makes a different amount of money than she does. The Labin case that – and so there were several admissions by her. First, when I showed her this memo and asked her if it was an accurate description in 2002 of what her duties were, she said yes. I said, in 2012 when you left, had your duties changed in any way from those described in this memo? And she said the only changes were down at the bottom of the page where it says if she has time, she'll participate in rounds and teaching. She said she never did that. That is the only change from this description to the time she left. And her primary job was in that job. Less than half of her time was spent as Director of Rehabilitation. And the representation was made that in that job, so she's not performing specialty medicine, unlike all the alleged comparators who are practicing specialty medicine. In fact, they've taken away from those other people the obligation to engage in extensive communication with these people in the President's Council, because she's going to do that for everybody. And that's going to result in her – that's a different skill as Judge Falia, applying your Port Authority case where the lawyers worked for the same client and the EOC never alleged what kind of law did they practice, because in that decision the court makes it clear that if lawyers are doing employee complaint cases like I do, it's not the same and probably not as important as negotiating multimillion-dollar deals. There's different skill sets. The decision lists several and say if these lawyers are doing those different – practicing those different aspects of the law, then they are not performing equal work. And in this case, that's exactly what we have. The closer case under the Port Authority case would be if among the five comparators, one of those brought an equal pay case. Ms. Caramonti, in my 40 years of practicing in the equal pay cases I've seen, I've never had a plaintiff say my job is unique in her complaint and then at her deposition. And we agree with that. We agree it's unique. Judge Falia found that it was unique. She admits it was unique. I'm sorry, Your Honor. All the doctors that were talked about in this record are highly educated, highly ranked, certified doctors, including the plaintiff. Your adversary points in the brief that we should really be focused on how much revenue is generated by these different departments. And by that measure, she was doing substantially equivalent work because she was drawing in money for the venture. Is that a correct way to think about these equal pay? Not at all, Your Honor. And actually, Judge Falia correctly says that that issue of either comparable worth or contribution from a particular job to the animal medical center is absolutely irrelevant to the Equal Pay Act. The only issue relevant really in this case is are the duties substantially equivalent or substantially equal? What do they do? Not what does it generate or how does that work? Is it accurate to say that the plaintiff was generating this revenue? Was she essentially running the President's Council and running the Rehabilitation Center? No, Your Honor. Courtney Rabb was deposed in this case. She's the Director of Marketing. The President's Council is a major marketing effort. It's where many of the donors come from. Many of the Board of Trustees members are members of the President's Council. As a result of that, they get first-in, first-out treatment when they need it for their pets, right? Absolutely, Your Honor. It's like saying the revenue from the Plaza Hotel comes from our first-class concierge. We have a special VIP concierge service for particular customers that are repeat. You can't say that all the revenue that comes from those guests who love this concierge and come back and mention how great that special concierge service is, that's why they come to the hotel. They come to the hotel for a million different reasons. All the employees of the hotel contribute to the experience that these people sustain. Maybe it's because of the specialized medicine that the comparator she sends to perform the work on, the person that puts the stents in the dog's heart or the cat's heart, the expert that sees 15 dermatology cases a day and can handle serious dermatology cases for a patient. That might be why a President's Council person gives us the money they give us. She is the gatekeeper, if you will, the greeter, the triage person. She meets the person and she says, I have just a doctor for you to see, and I'll be here all day to talk to you and walk you through these procedures and make sure everything's taken care of. That's why it's an average of one or two patients a day talking to those owners and making sure the experience at the hospital is good. But you can't claim that the millions of dollars that come from that program. This is a massive program. It involves lunches. It involves events. It involves mailing. It involves targeting. It's a marketing program, and it's a different skill. A doctor, I mean, it's a bedside manner thing, right? It's a doctor. If this was a law firm, and there wasn't one involved in your Port Authority case, but if it was a law firm, this would be one of my relationship partners, right, that meet and greet and go out and entertain and bring me back a client, and I do the Equal Pay Act cases for them. That's the situation that Dr. Chiamonti's in. She's not a practicing specialist. She's acting as the relationship person for the people in the President's Council. With respect to the rehab, there was some indication by my opponent that she actually performed some specialty medicine there. As Judge Drury pointed out, she couldn't answer my question. Just tell me one thing that you do at the rehab place, which is the minority of her time, and her testimony was, I set it up to be technician run, because I have to be at the President's Council all the time, at least four hours a day, and often more than that, because, as you heard from the memo, her primary responsibility is to take care of those people. So it's a technician run, not driven. It's actually run by the technicians. Every single service performed by the rehab center is done, according to her testimony, by either a technician or a technician supervising an aide. When I asked her, give me one thing that you've done in the rehab center that a technician doesn't do, she couldn't think of one. And when I asked her what she's actually done, the example she gave me was walking a dog on the treadmill, which I said I think even I could do. I walked slow enough that I could do that. That's all that she said she'd done. She's never done an invasive procedure in this job. She doesn't do invasive procedures. She's never treated an inpatient. It's a hospital. It's where people come to get better, and they stay there to get better. And she — We're not a jury, Mr. DeLorenzo. Thank you. If no more questions, I'll sit down. Thank you. This case is very different from Port Authority. In Port Authority, the plaintiffs did not make any reference to the actual content of any of the positions for attorneys at the Port Authority. They also chose comparators apparently at random, and if one looked at the pay practices across the board, they undercut a pay discrimination claim. The court and defendants tried to construe the facts against the plaintiff, for example, on supervision. The plaintiff at her deposition was asked about providing written evaluations and said she only did a written evaluation for the coordinator and the president's counsel. In other places, she and other people testified that on a day-to-day basis, she supervised the technician and the coordinator and the president's counsel and three techs, four aides, and at the end, a doctor in the rehabilitation center, and that all technicians formally report to the same person. So when they talk about Dr. Fischetti overseeing technicians, that's exactly the same as what Dr. Chiaramonte was doing. The revenue was the linchpin of compensation at the AMC. The chair of the board, who was actually involved in making compensation decisions during Dr. Chiaramonte's employment, he was on the compensation committee, said that that accounted for 50% to 75%. If you look of the calculation, and then they would look at did this person have other responsibilities as well, and were they good citizens and other factors. If you look at the documents that they were looking at, it listed revenue. It listed sometimes what the outside surveys did. There would be sometimes references to we look at other responsibilities, but they didn't detail anything else. And with respect to revenue, the chair of the board also testified for the president's counsel that it was not just the revenue, that it was in fact the donations, which were over $5 million in 2010, were even more important than the revenue. That is what they were looking at in making compensation decisions. And the EPA regulations say that in looking at whether a factor is important, you look whether it was something that at that location was a factor in setting compensation. So teaching and research were not factors that were used. The CEO testified it was among the many things that went into whether somebody was a good citizen or not, but it wasn't the linchpin of making compensation decisions. Drs. Messina and Fischetti, among the comparators, were paid more than Dr. West and more than Dr. Fox, and they had no research and no teaching responsibilities. The court also, you know, criticized Dr. Caramante's research, saying she hadn't published in a journal since 2009, textbook chapters didn't count, made no reference to her speeches, and then bought lock, stock, and barrel Dr. Goldstein's vague statement that some of her comparators made, quote, significant contributions to research. We don't know when they published, where they published, frankly, even if they've ever published anything. It was just a conclusory statement that the court relied upon in finding that they were not comparable to Dr. Caramante. Thank you.